UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------------x

              :

**ROMARIO BURKE**,

              Plaintiff,

             :    **COMPLAINT AND DEMAND FOR JURY TRIAL**

      -against-

**THE CITY OF NEW YORK;  CORRECTION OFFICER ROHR** (Shield No. 18104), NYC Department of Correction; **CORRECTION OFFICER DELIOTTE** (Shield No. 17100) NYC Department of Correction, **JOHN DOE**, Correction Officer, NYC Department of Correction**; JANE DOE 1,** Correction Officer, NYC Department of Correction; **JANE DOE 2,** Captain, NYC Department of Correction**,** NYC Department of Correction; **HAZEL JENNINGS**, Bureau Chief of Security, NYC Department of Correction; **CLAYTON AUGUSTUS**, Warden, Brooklyn Detention Complex, NYC Department of Correction; **JOSEPH PONTE**, Commissioner, NYC Department of Corrections

              Defendants.

-------------------------------------------------------------------------------------x


## PRELIMINARY STATEMENT

1.  On August 5th, 2015 at 3:00am in the morning, 20-year-old Plaintiff Romario Burke was abruptly woken by four Correction Officers at Brooklyn Detention Complex (BKDC). The Correction Officers shined flashlights to Mr. Burke's face and shouted to wake him for an unscheduled divisional search that would turn into a brutal assault.  Throughout the search, the Correction Officers harassed and taunted Mr. Burke hoping to get a reaction out of him. Correction Officers purposefully tore down pictures of Mr. Burke's girlfriend from the wall of his cell and stepped on them and read through his legal mail. When Mr. Burke complained about this injustice to these officers' superiors, the Correction Officers

1

retaliated against Mr. Burke, assaulting him with such force and aggression that they fractured his jaw on both sides and hyperextended his right index finger back so far that Mr. Burke believed it would break.

2. As a result of this act of brutality, Mr. Burke had to undergo reconstructive facial surgery to fix the damage that was done to his face.  Metal arch bars were placed and several screws were drilled into his gums, under his teeth, to put his jaw back together.  A permanent metal plate was also inserted under Mr. Burke's cheekbone to restore the symmetry of his face.

3. The assault of August 5th has left Mr. Burke traumatized. He continues to have nightmares of the brutal attack and often fears for his life. He is often triggered when Correction Officers make sudden movements, causing his palms to sweat and his heart to race. Mr. Burke will never be the same again.

4. This action arises out of the violation of Mr. Burke's Fourteenth Amendment rights under the United States Constitution and his bodily and physical integrity as protected by New York State laws against battery and assault.  This action is for the pain and suffering that Mr. Burke has endured as a result of the assault on August 5th, 2015.  He seeks compensatory and punitive damages against the perpetrators of this wrong.  This action is brought against every NYC Department of Correction's employee who participated in this attack by act or omission.

5. The brutal assault Mr. Burke has suffered is yet another example of the endemic violence and excessive force against inmates that has plagued city jails for decades, and which New York City Department of Correction (NYC DOC) officials—responsible for managing this jail's facilities—have condoned.  Multiple lawsuits, news articles, and a recent report by

the United States Department of Justice (DOJ), document and confirm this continued

practice of violence in city jails. For this reason, this action is being brought not only

against the Department of Correction employees who participated in this attack either by

act or omission but also against the City of New York, which is liable for condoning the

systemic use of unnecessary and excessive force by guards against inmates in city jails.

## JURISDICTION AND VENUE

6.   This action arises under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment of

the United States Constitution and New York State's law against assault, battery and

negligence .

7.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and

1367.

8.   Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b)(2)

and 1391(c) because a substantial part of the events giving rise to the claim occurred in

Brooklyn, New York, and both Plaintiff and Defendants reside in New York City.


## PARTIES

9.   **ROMARIO BURKE** is a 21-year-old pre-trial detainee from the Bronx who suffered

severe injuries while being housed at BKDC. Mr. Burke was sleeping when officers

abruptly woke him to conduct an unscheduled divisional search that left him with a

fractured jaw and permanent swelling to his finger.

10.  **THE CITY OF NEW YORK** is a municipal corporation duly incorporated and existing

pursuant to the laws of the State of New York and having its principal offices at City Hall,

New York, N.Y. 10007.  The City of New York has established and maintains the

Department of Correction (DOC) as a constituent department.  The DOC is responsible for the City of New York's detention facilities.

11.   **CORRECTION OFFICER ROHR (**Shield No. 18104) was a member of the party of officers searching Mr. Burke's cell at BKDC on August 5th, 2015.  He was also one of the two officers searching the inside of Mr. Burke's cell.  He participated in the assault against Mr. Burke. While Mr. Burke was restrained by other Correction Officers, he punched Mr. Burke repeatedly in the face.  Mr. Burke described him as a light-skinned man, in his mid-30s, approximately 5' 8".

17.   **CORRECTION OFFICER DELIOTTE (**Shield No. 17100) was a Correction Officer with the NYC DOC and a member of the party of officers searching Mr. Burke's cell at BKDC on August 5th, 2015.  He was one of the two officers searching the inside of Mr. Burke's cell. He participated in the assault against Mr. Burke.  Mr. Burke described him as a bald, African-American man with a beard, of average height and average build.

18.   **JOHN DOE** was a Correction Officer with the NYC DOC and a member of the party of officers searching Mr. Burke's cell at BKDC on August 5th, 2015.  He initiated the assault on Mr. Burke by punching him in the face from the side, after observing the ongoing search in his cell. He restrained Mr. Burke by placing his knee on Mr. Burke's back and hyperextending his right index finger.   Mr. Burke described him as tall, African-American, with a "Caesar" style haircut.

19.   **JANE DOE 1** was a Correction Officer with the NYC DOC and a member of the party of officers searching Mr. Burke's cell at BKDC on August 5th, 2015.  She was in charge of recording the search conducted on Mr. Burke's cell with a handheld camera.  She did not participate in assaulting of Mr. Burke, but she watched and did nothing to mitigate the

assault as it occurred, despite having ample opportunity to have done so.  Mr. Burke described her as an African-American woman with brown skin and of medium built, approximately 5 feet tall, who wore a curly black weave.

20. **JANE DOE 2** was a Captain with the NYC DOC on August 5th, 2015.  She was responsible for supervising the searches being conducted on that day. Mr. Burke describes her as  dark-skinned, African American, and in her early 30s.

21. **HAZEL JENNINGS** was the Assistant Chief of Security at BKDC on August 5th, 2015. She supervised the searches being conducted in inmate cells on the day that Mr. Burke was assaulted.

22. **CLAYTON AUGUSTUS** was the Warden of BKDC on August 5th, 2015, when Mr.Burke was attacked.  As the Warden of BKDC, he was in charge of managing the jail, a responsibility that includes ensuring that staff members utilize force appropriately.

23. **JOSEPH PONTE** was the Commissioner of the New York City Department of Corrections (NYC DOC) on August 5th, 2015, when Mr. Burke was attacked.  As the Commissioner of NYC DOC, he was responsible for ensuring that all jail facilities function in compliance with the law.  This responsibility includes ensuring that staff members utilize force appropriately. **STATEMENT OF FACTS**

*Assault on Mr. Burke*
24. On August 5th, 2015, Romario Burke was the victim of a brutal assault by Correction Officers during an unscheduled divisional search.

25. At about 3:00 in the morning, a search team of four Correction Officers—Defendants Rohr, Deliotte, John Doe, and Jane Doe 1—arrived at Mr. Burke's cell (Cell #11) on the D-side of the 7th Floor at BKDC.

26. Two of the officers, Defendants Rohr and Deliotte shined flashlights on Mr. Burke's face, yelling "get up!"

27. Defendants Rohr and Deliotte demanded that Mr. Burke strip to have his clothes searched. Mr. Burke willingly complied with the strip search and took his clothes off and passed them to the Defendants. Mr. Burke complied to a subsequent squat search and got dressed afterwards.

28. Mr. Burke was then instructed to grab his mattress, stand outside of the cell, face his cell and grab his mattress to his chest. Mr. Burke complied, standing approximately three feet from his cell, with his gaze towards his cell with his mattress in his arms as Defendants Rohr and Deliotte conducted the search.

28. Defendants John Doe and Jane Doe 1 remained outside of the cell with Mr. Burke.

29. During the search, Defendants Rohr and Deliotte took actions intended to provoke and anger Mr. Burke. They purposefully ripped photographs of Mr. Burke's girlfriend off the walls over his bed, threw them on the ground and stepped on them. They searched through an envelope visibly labeled "legal mail," which contained confidential information regarding Mr. Burke's criminal case.

30. When Defendants Rohr and Deliotte stepped on the pictures of his girlfriend, Mr. Burke asked them "Why y'all violating me?" and requested that they stop stepping on the pictures of his girlfriend. Nevertheless, these Defendants ignored Mr. Burke, and continued to step on the pictures.

31. Mr. Burke eventually got the attention of Defendant Jane Doe 2, a captain, who was on the floor supervising the search. Mr. Burke expressed to her his frustration with Defendants Rohr and Deliotte's behavior.

32. In response, Defendant Jane Doe 2 asked Defendants Rohr and Deliotte to pick up Mr. Burke's pictures. Jane Doe 2 then left Mr. Burke's room.  Once she left, Defendants Rohr and Deliotte continued to search through Mr. Burke's confidential legal documents and read the documents inside of it.  The envelope contained communications between Mr. Burke and his criminal attorney. Mr. Burke grew upset as Defendants Rohr and Deliotte continued to provoke him by reading through his envelope of confidential documents. Mr. Burke asked them again: "Why are y'all violating?" and told them to "stop searching through [his] legal mail."  Nevertheless, these Defendants ignored Mr. Burke's requests.

33. Mr. Burke sought help from Defendant Jennings, who at the time was the Assistant Chief of Security at BKDC. That night, Defendant Jennings was in charge of supervising the unscheduled divisional searches.  Mr. Burke explained to Defendant Jennings that Defendants Rohr and Deliotte were searching through his confidential legal mail.  In response, Defendant Jennings told Mr. Burke that he should not to worry about it if he does not have anything to hide.  Afterwards, she walked away, leaving Mr. Burke at the whim of Defendants Deliotte and Rohr.  Once Jennings left, Defendant Deliotte continued reading Mr. Burke's legal mail.

34. Mr. Burke, upset by Defendant Deliotte's action told him once again to leave his legal mail alone.  To which Defendant Deliotte replied: "shut your mouth."

35. Then, before Mr. Burke could say much else, Defendant John Doe, who was standing by Mr. Burke outside of his cell, punched him on the side of his face with such force that Mr. Burke fell forward into his cell.  After falling to the ground, a disorientated Mr. Burke reached forward to get his mail from Defendant Deliotte's hand.

36.    Before Mr. Burke could grab his mail from Defendant Deliotte's  hand, he put Mr. Burke in a tight headlock, preventing Mr. Burke from breathing.

37.    As Mr. Burke gasped for air, Defendants Rohr and John Doe  joined Defendant Deliotte, and grabbed his legs and arms.  Defendants Rohr and John Doe held Mr. Burke in place while Defendant Deliotte continued to choke him, cutting off the blood circulating to Mr. Burke's head.

38.    Eventually, the Defendants let go of Mr. Burke's arms and head. However, one of the Defendants still held onto Mr. Burke's legs causing Mr. Burke face to hit the concrete floor. Immediately after, John Doe 1 and John Doe 2 huddled over Mr. Burke and pinned a defenseless Mr. Burke down against the ground.

39.    Defendant John Doe pinned Mr. Burke to the ground by placing his knee on Mr. Burke's back. As he pressed his knee into Mr. Burke's spine, Mr. Burke began gasping for air. "I can't breathe!", he yelled, as he felt his lungs collapsing. John Doe ignored Mr. Burke as he continued to yell that he could not breathe. He grabbed Mr. Burke's right index finger and hyperextended so far that Mr. Burke exclaimed "you broke my finger!"

40.    Meanwhile, Defendant Rohr put on a pair of leather gloves.  After putting on the gloves, CO Rohr knelt down, and began to pummel Mr. Burke with a sequence of closed fist blows to his face, while Defendants Deliotte and John Doe pinned Mr. Burke to the ground.  With his arms and legs restrained, Mr. Burke could do little to protect his face from the CO Rohr's brutal assault. Mr. Burked yelled "I'm done!" as he tried to say something that could stop the Correction Officers from beating him. Defendants Rohr,  Deliotte, and John Doe ignored Mr. Burke and continued assaulting Mr. Burke.

41. By the end of the assault, Mr. Burke bled profusely from his head, around his left eye, and on the left area of his forehead. Defendants placed Mr. Burke's wrists into flexcuffs and dragged him into an outer hallway.

42. Defendant Jane Doe 1 was present throughout the assault and appeared to have been recording the attack on Mr. Burke with the same handheld camera she used to record the cell search.  Although she had time and opportunity to intervene, she made no attempt to prevent the assault on Mr. Burke.

43. Sometime after the assault, Defendant Jennings arrived at the scene and instructed the Correction Officers to pick Mr. Burke off the ground and take him to the medical clinic. A probe team—a separate group of Correction Officers in full body armor, with head and facial protection—escorted Mr. Burke to the jail clinic.

44. Mr. Burke's assault was unwarranted. His actions prior to being attacked consisted only of complying with the protocol of the search and asking for his personal belongings to be respected by Defendants Rohr and Deliotte.  Mr. Burke simply wanted the unscheduled divisional search to end so that he could return to sleep. Instead, Defendants Rohr and John Doe beat Mr. Burke so severely that he was left traumatized and disfigured.

***Mr. Burke's condition following the assault.***

45. Once at the jail clinic, Mr. Burke was placed in a holding pen, where his flex cuffs were cut and his injuries were photographed.  There, the doctor saw to Mr. Burke's injuries.  He appeared alarmed at seeing Mr. Burke covered with blood all over his face.  He asked him what had happened to him, and Mr. Burke explained to him that guards had assaulted him. The doctor cleaned the blood off Mr. Burke's face, gave him ibuprofen and a placed a sling on his right index finger.

9

46.  On the morning of August 6th, Mr. Burke woke up to sharp and stinging pains throughout his face. After being alarmed by the pain, Mr. Burke went to a mirror where he thought that his family may not recognize him again. In the reflection, Mr. Burke saw a swollen face he felt was abnormal and would never look normal.  Mr. Burke could barely mouth words and could not open his mouth. Mr. Burke experienced acute pains whenever he tried to open or close his jaw. These pains made it difficult for Mr. Burke to eat.  Mr. Burke had to resort to eating oatmeal and other non-solid foods because of how difficult it was for him to chew.

47.  Later that day, Mr. Burke procured more ibuprofen from the jail medical staff to find some relief for the pain he felt.

48.  From August 7th to August 8th, the correctional facility was in a state of total lockdown, known as a tactical search operation (TSO).  This meant that Mr. Burke was not able to leave his cell on these days, as all movements inside the jail were restricted.

49.  As a result of this, Mr. Burke was left hopeless without access to medical care or treatment. Mr. Burke spent two days in severe pain with nothing other than ibuprofen to treat the pain resulting from the fractures on both sides of his jaw.

50.  On August 8th, when the TSO ended, Mr. Burke met the facility nurse, who gave him only more ibuprofen.  He was not able to see the facility doctor until the next day, August 9th, 2015.  Upon seeing the intense swelling on his face, the doctor informed Mr. Burke that he needed x-rays.  He submitted a request to have Mr. Burke transported to Rikers Island for x-rays.

51.  Despite the doctor's order to transport Mr. Burke to have his x-rays taken, he was not transported to Rikers Island, where they would take his x-rays, until the next day.  The administration stated to Mr. Burke that they did not have transportation available.

52.  On the morning of August 9th, Mr. Burke was transported to the West Facility on Rikers Island, where he was taken in for x-rays of his face. Although Mr. Burke informed doctors that he needed urgent care, they stated that his file only indicated that he was only to receive x-rays, and was not to be given any additional treatment.

53.  Thereafter, he was transported back to the BKDC.  Later that day, when the facility doctor obtained the x-rays of Mr. Burke's face and found that his face was fractured, he ordered for Mr. Burke to be taken back to Bellevue.  Prior to being taken to Bellevue, Mr. Burke had a follow up appointment at the facility clinic for the sharp pain he felt throughout his jaw.

54.  On the night of August 10th, Mr. Burke arrived at Bellevue Hospital to have a CAT scans of his face performed.  The medical staff determined that Mr. Burke needed surgery since his jaw was fractured on both sides.

55.  Mr. Burke was scheduled for surgery.  However, he did not receive surgery until the next day.

56.  On August 12th, the surgery was conducted.  A metal plate was inserted in the bottom-right side of his jaw to reconstruct the original contour of Mr. Burke's face. Several metal screws were drilled into the upper and lower parts of Mr. Burke's gums and metal arch bars were temporarily placed at bottom and top of Mr. Burke's dental cavities to hold his severely fractured jaw in place.  The surgery was extremely painful for Mr. Burke causing him to cry throughout as he experienced levels of pain that rivaled those felt during the brutal assault.  Afterwards, doctors stated that the metal arch bars were scheduled to be removed two weeks.

57. On August 13th, Mr. Burke was transported back to the BKDC.  At around 9:00pm, Mr. Burke was transported to the North Infirmary Command on Rikers Island where he remained for approximately two weeks, before he was transported back to his cell at the BKDC.

58. As a result of the attack, Mr. Burke has sustained serious and long-lasting injuries.  He has lost sensation around part of his jaw and teeth, where the screws were placed to hold together the metal bars in his jaw.  He still feels pain in his jaw and around his gums for which he still sometimes takes painkillers. He sometimes experiences sharp pain in the right upper temple area of his head, which travels up from the jaw. The assault Mr. Burke suffered has left him traumatized and has filled him with dread. Whenever he sees any sudden movements near his cell, he sweats profusely and his heart beats rapidly. Still, Mr. Burke is constantly reminded of the brutal assault through nightmares. For Mr. Burke, things will never be the same.

59. The temporary arch bars—also known as metal wire inserts—inside of his mouth were supposed to have been removed in late August, two weeks after they were put in.  Despite numerous requests by Mr. Burke, these were not removed before his release from DOC custody in March, 2016.   Because the arch bars inserts remained in Mr. Burke's mouth long after they were supposed to be removed, his dental gums grew over them. The temporary arch bars became embedded inside of Mr. Burke's gums and required surgery. This arch bars caused Mr. Burke constant pain.  They also have caused Mr. Burke's mouth to emit a foul smell, and cause him to frequently bleed from his gums.


*New York City Department of Correction's long-held practice of condoning the use of excessive force by guards against inmates.*

60. The attack to which Mr. Burke fell victim to was not an isolated event.  It is part of a well-documented, long-held practice by the New York City Department of Corrections (NYC DOC) of condoning the use of excessive and unnecessary force by guards against inmates inside the Rikers Island Prison Complex.  Defendant City of New York and the personnel whose job it is to manage the jails under NYC DOC, such as Defendants Joseph Ponte, Clayton Augustus and Jennings, are responsible for executing this unconstitutional practice of violence.

61. A recent report by the Department of Justice ("DOJ") details the non-compliance of NYC DOC with the Civil Rights of Institutionalized Persons Act ("CRIPA").  The report, which reviewed approximately 200 cases containing instances of alleged excessive forces incidents at Rikers Island from 2012-2014, concludes that Rikers Island engages in a pattern and practice of violation of the constitutional rights of inmates, which effectively constitutes a "culture of violence."  The report finds that adolescent inmates at Rikers Island are particularly vulnerable to the threat of serious physical harm, stemming primarily from the rampant use of unnecessary and excessive force by DOC staff.  The report explains that on Rikers Island, there is a practice of utilizing force in response to verbal altercations.  Often, this use of force is in the form of "headshots," a type of force meant to be only utilized in exceptional circumstances.  In a review of NYC DOC 24-hour reports from October 2012 to early April 2014, the DOJ identified 64 incidents involving blows to an adolescent inmate's head or face.

62. These findings are not surprising.  For years, through Department reports and civil litigation, the DOC has been aware of the routine, dangerous, and unconstitutional use of excessive force by staff at DOC facilities.

63.  Since 2002, inmates have sued senior supervisors and uniformed staff in the DOC

repeatedly, collectively and individually, alleging staff beatings.  Many of these cases, all

resulting in favorable judgments for plaintiffs following settlement, include remarkably

similar allegations of misconduct.  For example:

- *Reynolds v. City of New York*, No. 11-cv-621 (S.D.N.Y.) (alleging beat-up in George Motchan Detention Center ("GMDC") resulting in shoulder fracture and loss of consciousness; settled for $200,500);
- *Mull v. City of New York*, No. 08-cv-8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight, and partial loss of hearing, requiring the victim to take seizure medications; settled for $550,000);
- *Belvett v. City of New York*, No. 09-cv-8090 (S.D.N.Y.) (alleging beat-ups at GMDC and Robert N. Davoren Center ("RNDC") resulting in facial fracture; settled for $350,000);
- *Youngblood v. Baldwin*, No. 08-cv-5982 (S.D.N.Y.) (alleging beat-up at GRVC resulting in skull laceration and broken nose; settled for $240,000);
- *Williams v. City of New York*, No. 07-cv-11055 (S.D.N.Y.) (alleging beat-up in Otis Bantum Correctional Center ("OBCC") resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);
- *Williams v. City of New York*, No. 09-cv-5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);
- *Lee v. Perez*, No. 09-cv-3134 (S.D.N.Y.) (alleging beat-up at North Infirmary Command ("NIC") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);
- *Shuford v. City of New York*, No. 09-cv-945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);
- *Diaz v. City of New York*, No. 08-cv-4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);
- *Lugo v. City of New York*, No. 08-cv-2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);
- *Cuadrado v. City of New York*, No. 07-cv-1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);
- *Scott v. City of New York*, No. 07-cv-3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);
- *Pischeottola v. City of New York*, No. 06-cv-2505 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung requiring chest tube; settled for $150,000);
- *Rice v. N.Y.C. D.O.C.*, No. 03-cv-582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas in one case, and in neck and spinal cord injuries causing permanent stutter in the other; settled for $255,000 and $590,000, respectively);

- *Joseph v. N.Y.C. D.O.C.*, No. 02-cv-9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

64. Furthermore, in *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), a class of inmates sued the city collectively for serious abuses and cover-ups committed by the City's Central Punitive Segregation Unit ("CPSU").

65. Similarly, *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), a class of inmates sued the City challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails. That litigation revealed significant numbers of credible excessive force complaints by prisoners who had been seriously injured by staff in the City jails. The settlement of that class action was intended to provide meaningful improvements in the training, practice, and supervision of DOC staff and investigators, and changes in the Department's use of force policy.

66. However, the City of New York and its Department of Correction have chosen to look the other way, preferring to pay settlements than to engage in necessary systemic reform.

67. Cover-ups have been a part of DOC's culture. The aforementioned DOJ Report details this culture of covering up instances of unnecessary and excessive use of force by falsifying reports or asking inmates to "hold it down"—whereby the guards ask inmates not to report incidents of force in exchange for preferential treatment. This culture of cover-ups permeates the NYC Department of Corrections. In fact, according to the New York Times, DOC's own investigators produced a report in 2012, which concluded that Department staff, including the Warden and Deputy Warden of the RNDC, had participated or been complicit in the intentional falsification of statistics in order to create the false appearance that violence in the jail was declining. The report stated that "no legitimate explanation exists for the dramatic and inaccurate decreases in the number of inmate

fights," and recommended that RNDC's warden and deputy warden be demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the facility's reporting of violence statistics."

68. Instead of demoting those officials, however, then-DOC Commissioner Dora Schriro ordered that the report be sanitized of any mention of their wrongdoing.  The United States Attorney's Office, which was in the midst of investigating violence at the jail, received only the doctored report.  When the cover-up was unearthed, the United States Attorney stated that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."

69. Another example of this culture of cover ups were the arrests of Captain Sherman Graham and Assistant Deputy Warden Gail Lewis on June 1, 2007 for covering up an assault on an inmate, as a result of an investigation by the New York City Department of Investigation. Captain.  Graham assaulted an inmate after he did not comply with a strip-search procedure in front of fifteen Correction Academy Recruits in training.  Following the assault, Graham ordered the recruits to falsify their Use of Force Witness Reports, writing that Graham assaulted the inmate in self-defense after the inmate punched Graham.  Lewis, Graham's supervisor, did not intervene to stop the attack, and also submitted a false Use of Force Witness Report.  Graham was charged with sixteen counts of Falsifying Business Records, sixteen counts of offering a False Instrument for Filing in the First Degree, sixteen counts of Official Misconduct, and one count of Attempted Assault in the Third Degree.  Lewis was charged with Falsifying Business Records, Offering a False Instrument for Filing and Official Misconduct.  A Bronx Jury found them both guilty on all charges on May 14, 2012.

70. In 2011, the City was named as a defendant in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that demonstrates the practice of widespread use of excessive force by Correction Officers at Rikers Island.  In that suit, the U.S. District Attorney for the Southern District intervened as a party alongside the plaintiffs.  The operative complaint in that suit, once again, was that "officers and captains" at Rikers "have inflicted brutal beatings on inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful, excessive force with impunity." Second Am. Compl., *Nunez v. City of N.Y.*, No. 11-cv-5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34, ¶ 1.

71. As a result of this lawsuit, the plaintiffs reached a settlement with the City on June 22, 2015, which included many reforms to the NYC Department of Corrections' use-of-force practices such as the installation of additional cameras to monitor the interactions between guards and inmates.  This settlement was supposed to mark, once and for all, change to the practices of violence at Rikers Island.

72. However, these ongoing reforms did not prevent the attack Mr. Burke suffered less than fifty days after the settlement, nor the others like it.

73. On September 4th, 2015, the Bronx District Attorney's office charged two Correction Officers with assaulting an 18-year old-inmate in a storage room where there were no video surveillance cameras, and then filing false paperwork to conceal their actions.

74. The City of New York and the Department of Corrections have been aware through their elaborate reporting system, numerous lawsuits, and myriad investigative reports of the customary use of unnecessary and excessive force in its jails.  However, they have not

taken sufficient steps to curb the abuses that occur on a daily basis in New York City jails. Rather, they have allowed the abuse to persist through inadequate investigations of allegations of misconduct, cover-ups, and the failure to discipline officers in the face of obvious wrongdoing.

75. Mr. Burke suffered severe physical and emotional harm as a result of the practices of violence that have shaped Rikers Island's correctional practices over the past decade, and for this reason he should be compensated.

## NOTICE OF CLAIM

76. On August 20th, 2015, Mr. Burke filed a notice of claim regarding the August 5th incident.

## CAUSES OF ACTION

## COUNT 1

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
(Use of Excessive Force in Violation of the Fourteenth Amendment)
Against Defendants Rohr, Deliotte, John Doe , Jane Doe 1, Jane Doe 2, Hazel
Jennings, Clayton Augustus, Joseph Ponte, and the City of New York**

77. Plaintiff repeats and re-alleges paragraphs 1-94 as if the same were fully set forth herein.

78. In severely assaulting Mr. Burke—fracturing his jaw and hyperextending his right index finger—as retaliation for a verbal exchange, Defendants Rohr, Deliotte and John Doe violated Mr. Burke's Fourteenth Amendment Rights to be free from the use of abusive and excessive force while awaiting trial.  Defendant Jane Doe 1 also violated Mr. Burke's constitutional rights by failing to intervene and stop the constitutional violation as it was happening, despite being a present observer.

79. Defendants Jane Doe 2, Jennings, Augustus, Ponte and the City of New York also violated Mr. Burke's Fourteenth Amendment rights by failing to take actions to stop the unlawful actions of their subordinates. Defendants knew of the pattern of unconstitutional use of

forces by corrections staff against inmates at the Rikers Island Jail Complex; nonetheless, did not take steps to stem the violence. Their actions constitute deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Burke's. Defendant City, through DOC, also permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality by DOC staff at the time of Mr. Burke's beating. This widespread tolerance of the abuse of Correction Officers against inmates constituted a municipal policy, practice, or custom and led to Mr. Burke's assault.

80. Defendants Jane Doe 2 and Jennings were present for the search operation and were aware of the harassment of Mr. Burke by the officers searching his cell. They failed to take any action that might deescalate the situation despite their awareness that the officers were escalating the situation and provoking Mr. Burke. Defendants Augustus and Ponte were also aware of the widespread excessive force by DOC officers but failed to take action to prevent these incidents.

81. Defendants acted under color of state law and within the scope of their employment at all times relevant to this Complaint.

82. Mr. Burke suffered the damages alleged as a direct and proximate result of the misconduct, indifference, and abuse of authority of the named defendants.

## COUNT 2

### Assault

### Against Defendants Rohr, Deliotte, John Doe, Jane Doe 1, Jane Doe 2, Hazel Jennings, Clayton Augustus, Joseph Ponte, and the City of New York

83. Plaintiff repeats and realleges paragraphs 1-94, as if the same were fully set forth herein.

84. By reason of the foregoing, and by approaching Mr. Burke and aiming to punch him in the face, Defendants Rohr, Deliotte and John Doe acting in their capacities as DOC officers

and employees, and within the scope of their employment as such, intentionally placed Mr.

Burke in apprehension of imminent offensive contact, and displayed the ability to

effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and

intentional assault on Mr. Burke.

85.   The assault committed by Defendants Rohr, Deliotte, and John Doe was unnecessary and

unwarranted in the performance of their duties as DOC officers and employees, and

constituted unreasonable uses of force.

86.   At the time of the attack, Defendants Jane Doe 2, Jennings and Clayton Augustus were

responsible for supervising the actions of Defendants Defendants Rohr, Deliotte, and John

Doe, and are thus responsible for their actions.

87.   The Correction Officers who attacked Mr. Burke did so during the course of their

employment, fulfilling their official capacity.  As such, the City of New York is vicariously

liable for the damage caused to Mr. Burke under a theory of *respondeat superior*.

88.   The negligent supervision by the New York City Department of Corrections, Joseph Ponte,

and the City of New York of the practices detailed above permitted this attack to be

perpetrated on Mr. Burke.  As such, they are also responsible.

89.   As a direct and proximate result of the misconduct, indifference and abuse of authority of

the named defendants, Mr. Burke sustained the damages hereinbefore alleged.

90.   Defendants acted under color of state law and within the scope of their employment at all

times relevant to this Complaint.

## COUNT 3

### Battery

**Against Defendants Rohr, Deliotte, John Doe, Jane Doe 1, Jane Doe 2, Hazel
Jennings, Clayton Augustus, Joseph Ponte, and the City of New York**

91. Plaintiff repeats and realleges paragraphs 1-94, as if the same were fully set forth herein.

92. By reason of the foregoing, and by intentionally placing Mr. Burke in a chokehold, punching him in the face, and bending his finger back forcefully, Defendants Rohr, Deliotte, and John Doe, acting in their capacities as DOC officers and employees, and within the scope of their scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Mr. Burke.

93. The battery committed by Defendants Rohr, Deliotte and John Doe was unnecessary and unwarranted in the performance of their duties as DOC officers and employees, and constituted unreasonable and excessive uses of force.

94. At the time of the attack, Defendants Jane Doe 2, Jennings and Clayton Augustus were responsible for supervising the actions of Defendants Rohr, Deliotte, and John Doe, and are thus responsible for their actions.

95. The Correction Officers, who attacked Mr. Burke, did so during the course of their employment, in their official capacities.  As such, the City of New York is vicariously liable for the damage caused to Mr. Burke under a theory of *respondeat superior*.

96. The negligent supervision by the New York City Department of Corrections, Joseph Ponte, and the City of New York of the practices detailed above permitted this attack to be perpetrated on Mr. Burke.  As such, they are also responsible.

97. Mr. Burke suffered the damages alleged—a bilateral jaw fractured and an injury to his index right finger—as a direct and proximate result of the misconduct, indifference and abuse of authority of the named defendants.

98. Defendants acted under color of state law and within the scope of their employment at all times relevant to this Complaint.

## DEMAND FOR RELIEF

**WHEREFORE, Plaintiff Romario Burke respectfully requests judgment against**

**Defendants as follows:**

A.      An order awarding compensatory and punitive damages against Defendants, in an amount

to be determined at trial;

B.      Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

C.      Directing such other and further relief as the Court may deem just and proper, together with

attorneys' fees, interest, cost, and disbursements of this action.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Romario Burke hereby

demands trial by jury on all claims asserted in the above complaint.


Dated: New York, NY
August 23, 2016


_____/s_____
BETSY GINSBERG, ESQ.
CARDOZO CIVIL RIGHTS CLINIC
Attorney for Plaintiff
Benjamin N. Cardozo School of Law
55 5th Avenue, 11th Floor
New York, NY 10003
(212) 790-0871
Betsy.ginsberg@yu.edu

NOQUEL MATOS
BENJAMIN PEÑA
*Legal Interns*